**RECEIVED**

OCT 12 2005

**CLERK
U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA**

## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

KIMBERLY CROCKETT,
FIELDSTONE VINEYARDS, INC., a
Minnesota Corporation, and WHITE WINTER
WINERY, INC., a Wisconsin Corporation,
                    Plaintiffs,

– versus –

MICHAEL CAMPION, in his official capacity
as COMMISSIONER OF PUBLIC SAFETY
OF THE MINNESOTA DEPARTMENT OF
PUBLIC SAFETY, and
NORMAN PINT, in his official capacity as
ACTING DIRECTOR OF THE DIVISION OF
ALCOHOL AND GAMBLING
ENFORCEMENT OF THE MINNESOTA
DEPARTMENT OF PUBLIC SAFETY,
                    Defendants.

Case Number: *05CV2386*
Constitutional Claims *ADM/JSM*

## CIVIL RIGHTS COMPLAINT FOR DECLARATORY RELIEF

### INTRODUCTION

1. This is a civil rights action seeking to vindicate the speech rights of two wineries and a Minnesota consumer who wants to buy wine directly from them.

2. Minnesota allows wineries to ship wine directly to Minnesota consumers who place orders over the telephone. But the State absurdly prohibits wineries from advertising and soliciting their direct-shipping services, and from accepting Internet orders for direct shipments to consumers in Minnesota. Compounding



SCANNED
OCT 12 2005
U.S. DISTRICT COURT MPLS

this absurdity, state law allows liquor stores to advertise, solicit and accept Internet

orders for direct shipment of their products.

3. As a result, Minnesota consumers may order wine from a local liquor

store's website, but they cannot order it from the website of a rural winery.

4. Minnesota's advertising and Internet speech ban violates the First and

Fourteenth Amendments to the United States Constitution and should be struck

down.

## JURISDICTION AND VENUE

5. This case is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and 28

U.S.C. § 2201. Subject matter jurisdiction is based on 28 U.S.C. §§ 1331 and

1343(a) (3) and (4).

6. Venue is appropriate pursuant to 28 U.S.C. § 1391(b).

## PARTIES

7. Plaintiff Kimberly Crockett ("Crockett") is a wine enthusiast and

consumer. She is a citizen of the United States and resides in Deephaven,

Minnesota.

8. Plaintiff Fieldstone Vineyards, Inc. ("Fieldstone" or "winery plaintiff")

is a fully licensed farm winery organized under the laws of Minnesota. Its

principal place of business is in Morgan, Minnesota, approximately 115 miles

southwest of the Twin Cities. Fieldstone's principals are Donald Reding, Chad

Reding, Charles Quast, and Mark Wedge. Its website is

www.fieldstonevineyards.com.

9. Plaintiff White Winter Winery, Inc. ("White Winter" or "winery plaintiff") is a fully-licensed winery organized under the laws of Wisconsin. Its principal place of business is in Iron River, Wisconsin, approximately 40 miles east of Duluth and 200 miles northeast of the Twin Cities. White Winter's majority shareholders are Jonathan and Kimberly Hamilton. Its website is www.whitewinterwinery.com.

10. Defendant Michael Campion is Commissioner of the Minnesota Department of Public Safety.

11. Defendant Norman Pint is the Acting Director of the Division of Alcohol and Gambling Enforcement of the Minnesota Department of Public Safety.

12. The Defendants are sued in their official capacities as representatives of the Minnesota Department of Public Safety, the agency responsible for regulating the manufacture, distribution, and sale of alcoholic beverages. *See* Minn. Stat §§ 340A.101, Subd. 6, 8, 340A.201, Subd. 2.

13. The State of Minnesota has granted authority to the Defendants to regulate the advertising of alcoholic beverages. *See* Minn. Stat. § 340A.507.

14. The Defendants and their employees, agents, and representatives have acted under the color of state law at all times alleged herein.

## STATEMENT OF FACTS

15. An increasing number of farmers recognize that growing grapes and making wine are feasible alternatives to growing traditional crops. Revenue from wine making is estimated at $2,500 per acre, far greater than the $300 per acre for soybeans, corn, and other traditional crops.

16. There are over 3,000 wineries in the United States today, three times as many as 30 years ago. The vast majority of wineries are small wineries that sell fewer than 36,000 bottles annually.

17. Approximately 30 states allow wineries to sell wine directly to consumers via common carrier to customers. Direct shipping has contributed to the growth and success of small wineries.

18. Direct shipping is important to small wineries because they have difficulty convincing wholesalers and retailers to devote time or shelf space to their products. Small wineries do not typically produce enough volume to make it economical for wholesalers and retailers to carry their wines. Moreover, the number of wholesalers has declined from 1,600 in 1984 to 600 in 2002 making it even more difficult for small wineries to use the traditional distribution channel.

19. Just last term, the Supreme Court recognized the benefits of direct shipping in striking down discriminatory bans on direct shipping in New York and Michigan. In *Granholm v. Heald*, 125 S.Ct. 1885 (2005), the Court noted that direct shipping was vital to small wineries and states could easily address

problems posed by underage drinking and tax collection without banning direct shipping.

20. E-commerce is also vital to small wineries because the Internet allows them to directly market products that otherwise would be unknown, unavailable or unaffordable to existing and potential customers in every state in the Union.

21. To realize the full benefits of direct shipping and e-commerce, wineries must be able to advertise their direct-shipping services, solicit direct-shipping sales to individual consumers, and accept Internet orders.

*Minnesota's Wine Industry*

22. The first winery in Minnesota opened in 1978, when the Alexis Bailly Vineyard released its 1977 vintage wines produced from 100% Minnesota-grown grapes.

23. The University of Minnesota is a leading developer of hybrid grapes and its Horticultural Research Center annually produces thousands of new grape seedlings. The seedlings are planted in vineyards and evaluated over time for viticultural traits such as cluster size, early ripening, and cold hardiness. The University of Minnesota has developed "cold-hardy" vines that can survive down to 35 degrees Fahrenheit below zero.

24. There are now 12 wineries in Minnesota that produce wine from St. Croix, Frontenac, and other grapes grown on "cold-hardy" vines.

25. The State commits significant resources to increasing the competitiveness and productivity of farming in Minnesota, which includes supporting the growth of vineyards and wineries.

26. Except for a few wineries near Stillwater, most wineries in Minnesota and western Wisconsin are too far from metropolitan areas to rely solely on foot traffic to sell their products. And they are too small to effectively engage third-party distributors. Accordingly, they rely on direct shipments for a growing percentage of their sales.

27. Direct sales and shipment enable wineries to sell wines free from mark-ups by wholesalers and retailers. Avoiding these mark-ups provides wineries with funds needed to expand their businesses.

28. Financial success requires that regional wineries be able to market their direct-shipping services to consumers in Minnesota.

29. However, Minnesota prohibits in-state and out-of-state wineries from advertising their direct shipping services to Minnesotans.

30. Minnesota also prohibits in-state and out-of-state wineries from soliciting customers in Minnesota to buy wine for direct shipment.

31. And Minnesota prohibits in-state and out-of-state wineries from accepting Internet orders from Minnesota customers.

32. In sum, Minnesota laws prohibiting speech about shipping services and speech over the Internet obstruct the growth of wineries that sell to Minnesotans.

### *Fieldstone Vineyards of Morgan, MN*

33. Fieldstone Vineyards is part of a farm that has been in the family of its president, Donald Reding, since 1901. Don's son, Chad Reding, and his son-in-law, Charlie Quast, are the fourth generation to be involved with the farm.

34. Fieldstone got its start in 1999 after receiving a grant from the State of Minnesota's Energy and Sustainable Agriculture Program. The following year, Fieldstone planted 256 cold-hardy grapevines on approximately 2/3 of an acre and purposely did not cover the vines during the winter. A total of 238 vines survived the winter. This 93% success rate exceeded expectations.

35. In 2001, vintner Mark Wedge joined Fieldstone. He helped the Redings and Quast plant additional vines and convert a barn into a retail outlet, which opened in the spring of 2003. In 2005, Fieldstone will produce approximately 10,000 bottles of wines.

36. Direct sales to customers comprise a significant portion of Fieldstone's current sales and are an essential component of its growth strategy. To grow, Fieldstone must advertise (e.g., in newspapers) and directly solicit new and repeat consumers (e.g., postcards promoting direct shipping, e-newsletters advertising new offerings, etc.). Based in a town of only 903 residents, Fieldstone must be able to communicate with consumers beyond Morgan if it is to prosper.

37. Laws restricting Fieldstone's communication with customers threaten its viability and rob Don, Chad, Charlie, and Mark of their opportunity to contribute to the continuing vitality of the Redings' long-held family farm.

*White Winter Winery of Iron River, WI*

38. There are approximately 30 wineries in Wisconsin. About ten of the wineries are located in western Wisconsin within 75 miles of Minnesota. Many vacationing Minnesotans visit these wineries during the spring and summer, and most particularly, during the fall.

39. White Winter Winery is one of the ten western Wisconsin wineries. It sits near a unique 12-square-mile microclimate along the shores of Lake Superior. The winery specializes in producing mead, an ancient style of wine made from honey and fresh fruit.

40. Jon and Kim Hamilton founded White Winter in 1996 after years of backyard beekeeping and amateur winemaking. One of their founding principles is to help develop a sustainable rural economy in the region. To do so, the Hamiltons purchase honey, fruit, and other ingredients from nearby producers in rural Wisconsin and Minnesota.

41. White Winter's marketing strategy is similarly focused on customers in the region. Sales to consumers visiting its winery and other direct sales, including Internet sales, constitute 85% of White Winter's sales of 50,000 bottles annually. To grow sales, the winery must be able to communicate to customers in Minnesota and other states. It is essential for the winery's success that it attracts customers from, the Twin Cities, Duluth, and other cities in northeastern Minnesota.

42. To that end, White Winter must be able to advertise its shipping services in newspapers and on radio in the Minneapolis-St. Paul and Duluth-

Superior metropolitan areas. And because customers do not always travel to the winery, particularly in winter, White Winter must also be able to solicit both existing and new Minnesota-based customers.

43. Laws restricting White Winter's communication with customers in Minnesota undermine the Hamiltons' ability to execute their business plans, to support rural economic development, and to realize their hopes for White Winter Winery.

### Kimberly Crockett of Deephaven, MN

44. Kim Crockett is a busy parent and an active member of her community. She is an attorney, a member of Deephaven's city council, a mother of two school-aged children, and a wife. Her time to purchase wine does not always coincide with the hours the wineries' customer-service representatives are available.

45. Crockett wants to read advertisements and receive solicitations from wineries regarding wines available for direct purchase. She also wants to order wines over the Internet from Fieldstone, White Winter, and other wineries in and out of Minnesota. But she is prohibited from communicating in these ways because Minnesota censors the wineries' speech about their shipping services.

### Prohibition of Advertising & Solicitation of Direct Shipping

46. Minn Stat. § 340A.417 (a) allows in-state and out-of-state wineries to directly ship wine "for personal use and not for resale, not more than two cases of wine, containing a maximum of nine liters per case, in any calendar year to any resident of Minnesota age 21 or over."

47. Minn. Stat. § 340A.417(b) requires wineries that direct ship to clearly mark on their packages: "Alcoholic Beverage: adult signature (over 21 years of age) required." And 18 U.S.C. § 1263 requires wineries to generate and maintain documents that identify the contents, quantities and recipients of all wine shipments. The winery plaintiffs comply with these state and federal laws.

48. Despite allowing the winery plaintiffs to direct ship, Minnesota prohibits them from advertising and soliciting direct shipments, and from accepting orders over the Internet from state residents.

49. Minn. Stat. § 340A.417(c) states:

No person may (1) advertise shipments authorized under this section, (2) by advertisement or otherwise, solicit shipments authorized by this section, or (3) accept orders for shipments authorized by this section by use of the Internet. No shipper located outside Minnesota may advertise interstate reciprocal wine shipments in Minnesota.

50. Upon information and belief, the Defendants prohibit any advertising or solicitation of direct wine shipping by in-state and out-of-state wineries, including the winery plaintiffs, over any medium of communication pursuant to Minn. Stat. § 340A.417(c) (1) and (2).

51. Upon information and belief, the Defendants prohibit Fieldstone and White Winter from: advertising direct shipping in newspapers or on radio; giving consumers visiting their wineries business cards or flyers that state the availability of direct shipping services; sending e-mails or postcards to customers advising

them of new wines available for direct shipment; and other types of commercial speech related to direct shipping of wine to Minnesotans.

52. Minn. Stat. § 340A.417(c)(1) has extraterritorial reach and effectively bans advertisements directed by broadcast media to residents of other states because there is no practical way to prevent radio and television advertisements that originate from stations near state borders from reaching Minnesota residents.

53. Minn. Stat. § 340A.417(c)(1) and (2), facially and as applied, prohibit the dissemination of non-misleading commercial speech about a legal product to Minnesota consumers and fails to further any government interest.

### *The Discriminatory Prohibition of Internet Acceptances*

54. Minn. Stat. § 340a.417(c)(3), facially and as applied, prohibits speech over the Internet sufficient for in-state and out-of-state wineries to accept orders from Minnesota consumers.

55. This statutory provision, facially and as applied, prohibits Fieldstone and White Winter from saying to Crockett and other Minnesota consumers the equivalent of "I accept your proposal to buy X wine at Y price" over the Internet.

56. Thus, Minn. Stat. § 340a.417(c)(3), facially and as applied, makes e-commerce impossible between Crockett and each winery plaintiff by prohibiting Internet speech.

57. At the same time, the Defendants allow wineries to accept orders for direct shipment by telephone, fax, and mail.

58. As a result, the Defendants' interpretation and application of Minn. Stat. § 340a.417(c)(3) prohibits speech over the Internet and discriminates in favor of speech by other media, such as telephone, fax, and mail, to accept wine orders.

59. Furthermore, upon information and belief, the Defendants have interpreted and applied Minnesota laws and rules, including Minn. R. 7515.0580, as permitting retailers, such as liquor stores, to accept orders for wine by use of the Internet.

60. As a result, a local liquor store can accept a Minnesota customer's Internet order for wine from its website, but a rural winery, which may be hundreds of miles from a potential customer, cannot accept that customer's internet order for wine from its website.

### *Minnesota's Advertising & Internet Speech Ban*

61. Taken together, Minnesota's prohibition on advertising and solicitation of direct wine shipments in Minn. Stat. §340A.417(c)(1) and (2) and its prohibition on Internet acceptances in Minn. Stat. §340A.417(c)(3) constitute, facially and as applied, an "**Advertising & Internet Speech Ban**" aimed at wineries and their Minnesota customers.

62. The Advertising & Internet Speech Ban is bad for business because wineries cannot sell products to consumers with whom they cannot communicate.

63. The Advertising & Internet Speech Ban is inconsistent with the State's expenditures supporting the growth of the grape and wine industries in Minnesota.

64. The Advertising & Internet Speech Ban also censors wineries'

communication with their consumers over a medium—the Internet—that is the

most efficient and effective means of communication available to small

businesses. And, thus, it makes e-commerce impossible.

65. Furthermore, the Advertising & Internet Speech Ban prevents

Minnesota consumers from obtaining non-misleading information about the wines

they may wish to purchase and from effectively transacting with wineries with

which they may wish to do lawful business.

66. And the Advertising & Internet Speech Ban frustrates the First

Amendment's goal of ensuring the free flow of commercial information to guide

the allocation of economic resources.

67. Finally, the Advertising & Internet Speech Ban chills free speech

because two or more violations within a two-year period can subject wineries to

misdemeanor or gross misdemeanor criminal charges, including the possibility of

fines amounting to $3,000 per occurrence and/or incarceration as long as one year.

*See* Minn. Stat. § 340A.417(f) and (g).

## FIRST CAUSE OF ACTION

## (VIOLATION OF FIRST AMENDMENT)

68. The allegations contained in paragraphs 1-67 are incorporated by

reference as if fully set forth herein.

69. Upon information and belief, the Defendants have enforced or intend to enforce the Advertising & Internet Speech Ban through criminal proceedings, fines, and other means.

70. Kim Crockett wants to read advertisements and receive solicitations from the Fieldstone, White Winter, and other wineries about direct shipments of wine. And she wants to communicate over the Internet the information needed to purchase wine from Fieldstone, White Winter, and other wineries.

71. Fieldstone and White Winter want to advertise and solicit direct shipment of their products to Crockett, existing customers, and potential customers. And Fieldstone and White Winter want to receive and transmit over the Internet the information needed to accept orders from Crockett, existing customers, and potential customers.

72. Fieldstone and White Winter spend substantial amounts of money on advertising, soliciting, and maintaining their websites and would do so to inform Minnesota consumers, including Crockett, of the quality, price and availability of their products, shipping services, and ordering processes if not for the existence of the Advertising & Internet Speech Ban.

73. The First Amendment to the U.S. Constitution, applied to the states through the 14th Amendment, prohibits Minnesota from making any law abridging freedom of speech.

74. The Advertising & Internet Speech Ban, facially and as applied, prohibits both non-misleading advertising and solicitations as well as speech over the Internet.

75. The Advertising & Internet Speech Ban also, facially and as applied, discriminates against one medium—the Internet—by requiring the use of only traditional media, such as the telephone, fax, and mail, to communicate commercial information.

76. And the Advertising & Internet Speech Ban, facially and as applied, discriminates against one type of speaker—a winery—and grants preference to other speakers, such as liquor stores.

77. Moreover, the Advertising & Internet Speech Ban does not advance any state interest, and it is far more extensive than necessary.

78. The First Amendment prohibits Minnesota from abridging freedom of speech even when the listener could come by the speaker's message by some other means.

79. As a result, the Advertising & Internet Speech Ban violates the First Amendment rights of Fieldstone, White Winter, and Crockett to engage in protected commercial speech.

80. The plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their constitutional rights.

81. Unless the Advertising & Internet Speech Ban is declared unconstitutional, and the Defendants, their employees, agents, representatives, and successors are enjoined from committing the above violations of the plaintiffs' rights to free speech under the First Amendment, as guaranteed by the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983, the plaintiffs, and those similarly situated, will continue to suffer great and irreparable harm.

## SECOND CAUSE OF ACTION

## (VIOLATION OF EQUAL PROTECTION)

82. The allegations contained in paragraphs 1-81 are incorporated by reference as if fully set forth herein.

83. The Defendants dissimilarly treat licensed retailers and the winery plaintiffs relative to their First Amendment rights by allowing licensed retailers to advertise direct shipping services and accept Internet orders from Minnesotans while prohibiting wineries from doing the same.

84. The Defendants discriminate between speakers, relative to the exercise of First Amendment rights, based solely on the identity of the speaker.

85. The Defendants also deprive Fieldstone and White Winter of any cost savings of Internet communication by unequally forcing them to engage in speech exclusively through traditional telephonic, mail, fax, or in-person contact, and prohibiting it through the Internet.

86. Moreover, the Defendants have no reason to deny the plaintiffs equal protection under the law.

87. The Defendants have interpreted and applied Minn. R. 7515.0580 and Minn. Stat. § 340A.417(c)(1) through (3) in violation of the equal protection clause of the Fourteenth Amendment by unequally restricting the First Amendment rights of Fieldstone and White Winter and by preventing Crockett from hearing what Fieldstone and White Winter have to say over the medium of their choice.

88. The plaintiffs have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their fundamental rights.

89. Unless the Advertising & Internet Speech Ban is declared unconstitutional, and the Defendants, their employees, agents, representatives, and successors are enjoined from committing the above violations of the plaintiffs' rights to equal protection under the law as guaranteed by the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983, the plaintiffs, and those similarly situated, will continue to suffer great and irreparable harm.

## REQUEST FOR RELIEF

For the foregoing constitutional violations, the plaintiffs respectfully request that this Honorable Court:

A. Enter a judgment declaring that Minn. Stat. § 340A.417(c), including subparagraphs (c)(1) through (3), facially and as applied by the Defendants, their employees, agents, representatives, and successors, violates the First and Fourteenth Amendments to the U.S. Constitution, and that the winery plaintiffs

have the constitutional right to engage in truthful, non-misleading advertising and

solicitation of sales and shipments authorized by Minn. Stat. § 340A.417(a) and

(b), as well as to freely accept orders for sales and shipments authorized by Minn.

Stat. § 340A.417(a) via the Internet;

B.  Declare that no civil or criminal liability may attach for any violation of

Minn. Stat. § 340A.417(c), including subparagraphs (c)(1) through (3), or for

engaging in truthful, non-misleading advertising and solicitation of sales and

shipments of legal products authorized by Minn. Stat. § 340A.417(a) and (b), or

for accepting orders for sales and shipments authorized by Minn. Stat. §

340A.417(a) and (b) via the Internet;

C.  Preliminarily and permanently enjoin defendants and their employees,

agents, representatives, and successors: (1) from utilizing their authority under

Minn. Stat. § 340A.507, and any other lawful authority to enforce, directly or

indirectly, Minn. Stat. § 340A.417(c), including subparagraphs (c)(1) through (3),

or substantially similar restrictions on commercial speech; (2) from seeking civil

or criminal sanctions against plaintiffs and those similarly situated, for any

violation of Minn. Stat. § 340A.417(c), including subparagraphs (c)(1) through

(3), or substantially similar restrictions on commercial speech; and (3) from

subjecting plaintiffs and those similarly situated, directly or indirectly to legal

action, loss of licensure (or permitting), the refusal to process licensure

applications (or permitting applications), or other harassment or punitive action for

any violation of Minn. Stat. § 340A.417(c), including subparagraphs (c)(1)

through (3), or substantially similar restrictions on commercial speech, as amended or supplemented from time to time.

D. Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

E. Award such other further relief as the Court deems just, equitable, and proper.

RESPECTFULLY SUBMITTED this 12th day of October 2005.

INSTITUTE FOR JUSTICE
MINNESOTA CHAPTER


By _____
Lee U. McGrath (Minn. No. 0341502)
Executive Director
lmcgrath@ij.org


By _____
Nick Dranias (Minn. No. 0274537)
Staff Attorney
ndranias@ij.org


Institute for Justice Minnesota Chapter
527 Marquette Avenue-Suite 1600
Minneapolis, MN 55402-1330
Phone: (612) 435-3451
Fax:    (612) 435-5875
www.ij.org